Filed 2/7/23 P. v. Muhammad CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ODELL OMAR MUHAMMAD,<br><br>    Defendant and Appellant. | F082683<br><br>(Super. Ct. No. CF01659650)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County. Kristi Culver Kapetan, Judge.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill, Carlos A. Martinez, and Jeffrey D. Firestone, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Petitioner Odell Omar Muhammad petitioned the superior court, pursuant to former section 1170.95 (now § 1172.6) of the Penal Code,[1] for resentencing on his conviction for second degree murder. The superior court held an evidentiary hearing (§ 1172.6, subd. (d)) and denied the petition on the grounds (1) the jury instructions established petitioner was not convicted under a felony murder or natural and probable consequences theory, (2) the jury convicted petitioner as a direct aider and abettor who acted with actual malice, and (3) the jury determined petitioner was a major participant in the underlying felony who acted with reckless disregard for human life.

On appeal, petitioner contends the superior court erred in determining the jury instructions establish he was ineligible for resentencing. He argues the jury instructions compel a contrary conclusion: that resentencing is mandatory. Additionally, he argues the superior court was precluded from finding him ineligible for resentencing as a major participant in the underlying felony who acted with reckless indifference to human life because he was acquitted of first degree felony murder and second degree felony murder has been abolished. He further argues the superior court applied an erroneous standard of review, erred in relying on our opinion from his direct appeal as the sole evidentiary basis for its ruling, and erred in failing to account for his youth in evaluating his petition. Finally, he argues the prosecution failed to prove beyond a reasonable doubt that he is guilty of murder under a valid theory, as required under section 1172.6, subdivision (d).

We conclude the jury instructions neither establish petitioner's ineligibility for resentencing nor mandate resentencing. Additionally, in light of the superior court's reliance on our prior appellate opinion as the evidentiary basis for its ruling, we will

---

[1] Undesignated statutory references are to the Penal Code. Former section 1170.95 was renumbered section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.) We will refer to the current section 1172.6 in this opinion.

reverse the superior court's order and remand for a new resentencing hearing. We address petitioner's remaining contentions to the extent they are relevant on remand.

## FACTUAL BACKGROUND

As we explained in petitioner's direct appeal,[2] "[o]n December 17, 2000, 69-year-old Alejandro Escareno (Escareno) was robbed of his pocket change and beaten to death by a group of teenagers, as he stood in front of a neighborhood market and waited for a bus. All of the assailants were members of the same family, and the assault occurred as several neighbors watched and did nothing. About one week earlier, many of the same assailants assaulted and beat Jose [D.] and Ricardo [H.[3]] as they were parked at the same market. Again, several neighbors watched the assault and did nothing to stop it.

"Nine people were originally charged with the robbery and assault of [Jose] and [Ricardo], and the robbery/murder of Escareno: Raheem Rashad Muhammad (born 1982); Willie Jamal Muhammad (born 1980); Ibrahim Abdullah Muhammad (born 1979); [petitioner] (born 1983); Kevin Lamont Muhammad (born 1972); F.K.M. (born 1984); S.M. (born 1984); H.M. (born 1985); and M.H. (born 1983).[4]

---

[2] As we explain in detail below, our opinion from petitioner's direct appeal was the only factual record admitted in the superior court in relation to the resentencing petition. We therefore deny the People's September 16, 2022 motion to incorporate by reference or, alternatively, judicially notice, the entire record on appeal from petitioner's direct appeal. (See *People v. Preslie* (1977) 70 Cal.App.3d 486, 493 [generally, court should not take judicial notice of matter that has not been presented to and considered by the trial court in the first instance]; see also *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3 [same].)

[3] Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names or initials. Additionally, to avoid confusion, we refer to members of the Muhammad family by first name. No disrespect is intended.

[4] As discussed further below, a separate juvenile proceeding was brought against C.A. and M.M. Our prior opinion describes C.A. as petitioner's cousin. (See fn. 13, *post.*)

3.

"The trial court granted numerous severance motions, resulting in the separate prosecutions against the assailants." (*People v. Muhammad* (Sept. 30, 2005, F043303) [nonpub. opn.] (*Muhammad*).) Petitioner and Raheem were tried jointly. (*Ibid.*) We previously summarized the evidence from their joint trial as follows.[5]

"**Robbery/Murder of Alejandro Escareno (Count 1)**

"Alejandro Escareno lived on East Jensen in Fresno with his adult son. Escareno was 69 years old and had lived in the neighborhood for 20 years. Escareno regularly used the city bus to get around town, and had a frequent rider pass. Escareno usually caught the 10:00 a.m. city bus, from the bus stop in front of [a local m]arket, and went downtown to visit acquaintances. Escareno generally was in good health but his eyesight was failing. Moreover, he was occasionally disoriented about the time of day, and sometimes got off at the wrong bus stop.

"Escareno's son testified that his father knew there had been trouble at the local market and he tried to avoid confrontations. 'He was . . . very peaceful, timid, very meek.' If someone asked him for money, he probably would give some cash if the person needed it. He often carried a substantial amount of cash because he did not want to deposit it at the bank.

"Kenneth [M.] drove the city bus through the neighborhood, and knew Escareno as a frequent passenger who boarded at the bus stop by the market and traveled downtown. Around 4:42 p.m. on December 17, 2000, [Kenneth] was ahead of schedule

---

[5] We omit discussion of the facts relating to the assault on Jose and Ricardo as irrelevant to the petition. We additionally omit discussion of the gang evidence, except to note that a police officer testified that the Muhammads were a large extended family of approximately 150 to 200 members, several of whom lived near the corner of Walnut and Garrett Streets in Fresno County. The officer opined that a subgroup of 15 to 20 Muhammad family members comprised a criminal street gang, and that the Muhammad gang was associated with two other gangs. According to the officer, the Muhammad gang claimed a large territory between Walnut, Garrett, and Jensen Streets. (*Muhammad*, *supra*, F043303.)

as he arrived at the market. He needed to wait for the correct arrival time in case there were any passengers, and decided to go into the market and buy a soda. As he drove up to the bus stop, [Kenneth] saw Escareno walking up and down the sidewalk. Escareno looked kind of confused and unsteady, and he repeatedly changed directions as he walked around.

"[Kenneth] testified a young African-American teenager rode a bicycle around the bus. He appeared around 11 to 14 years old. He was followed on foot by two other teenagers: one was about 11 to 14 years old, and the other was about 17 to 18 years old. As the three teenagers moved toward the bus, Escareno moved away from it; when the teenagers moved away from the bus, Escareno walked toward it. [Kenneth] thought Escareno could not decide whether he wanted to get on the bus.

"[Kenneth] went into the market, purchased a soda, and returned to the street. [Kenneth] noticed the teenager on the bicycle was harassing other customers as they left the store. [Kenneth] testified the teenager on the bicycle rode up to him and said, ' "Give me your soda." ' [Kenneth] replied there were plenty of sodas in the store and to get his own. The teenager said, ' "No, I want yours. I want yours." ' [Kenneth] said no and headed for his bus. The teenager kept riding around and harassing him. The other teenagers were further away but they seemed in communication with each other.

"[Kenneth] returned to the bus and closed the door. The teenager on the bicycle knocked on the door and said he needed to take the bus. [Kenneth] opened the door and the same teenager said, ' "Psych, you fool. You shouldn't have opened the door." ' [Kenneth] testified the teenager acted like a typical 'obnoxious juvenile[].' [Kenneth] replied that he thought he needed to take the bus. The teenager said, ' "No one here needs the bus. Continue on." '

"[Kenneth] apparently took the teenager's advice and drove away from the bus stop. As [Kenneth] left the area, he noticed Escareno was walking down Garrett Street. [Kenneth] thought about pulling over to pick up Escareno, but it was against policy to

5.

stop and pick up someone on the street who was not at a bus stop. [Kenneth] had just been hired as a bus driver that year, and he did not want to lose his job. [Kenneth] drove on and did not see anything else.[6]

"Ricky [P.] was . . . sitting on the porch at Estelle [H.'s] house, across the street from the market, and observed the entire sequence which led to Escareno's death. [Ricky] was visiting [Estelle's] son, Leroy [H.]. They were joined by her other son, Anthony [P.]. [Ricky] admitted he used crack cocaine and drank beer earlier that day.

"[Ricky] testified he saw an 'old man' standing across the street at the bus stop. He had seen this man at the bus stop on other occasions, and they occasionally took the same bus. [Ricky] later identified this person as Alejandro Escareno.

"[Ricky] testified he observed three separate encounters between Escareno and a group of African-American assailants, which culminated in Escareno's death. The first encounter began as Escareno walked down the street and was approached by a group of teenagers from the Muhammad family. The Muhammads turned the corner from Garrett to Walnut and walked along with Escareno. [Ricky] thought Escareno was going to buy some drugs from them, but the teenagers 'jump[ed]' him and began to beat and kick Escareno. [Ricky] testified the group consisted of Raheem, [petitioner] (also known as 'Yack'), F.K.M., S.M., M.M., C.A., Hakim,[7] Kevin, and M.H. [Ricky] testified several younger members of the Muhammad family, from five to nine years old, were also in the group, and described them as 'the new generation of the Muhammads.' [Ricky] believed they emerged from the home of their grandmother, Evelyn Muhammad, on Garrett Street. There were about 11 people in the group.

---

[6] "Kenneth . . . reviewed numerous photographic lineups and stated that both C.A. and [petitioner] 'resembled' the teenager on the bicycle who rode around the bus and told him to leave."

[7] It does not appear anyone named Hakim was charged in relation to this offense.

6.

"[Ricky] testified all of the assailants were punching and kicking Escareno and he fell down. [Ricky] testified that after Escareno fell down, the assailants stopped hitting and kicking him, but instead went through his pockets. The younger children in the group did not join the assault but just watched. C.A. and M.M. also punched and kicked Escareno, and they were 'going for his pockets, pulling for change. I mean, just whatever they was going for, they was going for it . . . I heard change fall. They was at his pockets.' They were 'grabbing his jacket, pants, they was everywhere.' [Ricky] heard C.A. say ' "that guy came up." ' [Ricky] testified the phrase meant 'basically like you got what you wanted. . . . Like, I mean, "You livin' better when you came up," ' that they got what they were looking for.

"[Ricky] testified the assailants left Escareno on the street and went back around the corner, down Garrett Street, toward a house. Escareno continued to l[ie] on the street next to the curb, and it 'seemed like he was out because he wasn't movin' at first.' After a few minutes, Escareno seemed to regain consciousness. He stood up and 'was kind of staggering like he wasn't all there.' [Ricky] testified that 'for some reason,' however, Escareno walked toward the corner of Walnut and Garrett.

"[Ricky] testified the second encounter began at that point, when 'the same crowd' of Muhammads returned around the corner. [Ricky] testified the group included Raheem, [petitioner], F.K.M., M.H., S.M., C.A., M.M., and 'a lot of little bitty kids.'[8] The group again attacked Escareno, and they were kicking and hitting him. The younger children watched as the older children assaulted Escareno. The assailants told Escareno to ' "Get up. Get up, go. Get away from here." ' They continued to punch and kick him as if they were trying to get him to move along, but they were not kicking him hard. [Ricky]

---

**8** "On redirect examination, [Ricky] testified he was not sure if Raheem was present during the second encounter."

7.

testified Escareno stood up, and the assailants left the area and went back around the corner.

"[Ricky] testified Escareno was wobbly and seemed like 'a drunk person. He was trying to get his composure, I guess.' 'I don't know why he turned, went back down that corner again, but that's where he went,' toward the corner of Garrett and Walnut. He was still unsteady and tried to maintain his balance as he walked. Escareno made it to the corner and looked down Garrett Street. [Ricky] believed the assailants were able to see him from that position: 'I assumed that was the reason they came back because he stood right on the corner and he looked down [that] way.'

"[Ricky] testified the third encounter began when a 'lot' of the same group, accompanied by the 'little kids,' ran down Garrett Street toward Escareno. 'All of them came mostly, like, just about runnin' down the sidewalk, tellin' him to, "Get on, leave." Pushin' him, tellin'—leave.' Raheem was part of this group.

"[Ricky] was still on the porch with [Anthony] when someone from the group shouted to them: ' "Come get your friend." ' [Ricky] initially testified that person was Raheem, but he thought about it and changed his mind: 'I said Raheem, but in my mind it was Yack [petitioner], but I don't know why I said Raheem.' [Ricky] testified that Estelle [H.], [Anthony's] mother, was on the porch and responded that [Anthony] did not know the man. [Ricky] admitted no one intervened to help Escareno or told the group to leave Escareno alone.

"[Ricky] testified that at that moment, someone from the group resumed the assault and delivered a single punch to Escareno with a closed fist. Escareno 'just fell,' and 'then he didn't move, that was it.' 'It happened so fast, it just—boom, hit him and he fell. And everybody just took off and left.' [Ricky] testified the crowd ran back down the street, and probably returned to the grandmother's house.

"[Ricky] testified this last group consisted of Raheem, [petitioner], S.M., M.M., C.A., and F.K.M. There were other people in the group but [Ricky] could not recall their

names. [Ricky] initially stated that S.M. threw the final punch, but subsequently said that H.M. threw the last blow. [Ricky] never said that Raheem threw the final punch.

"[Ricky] admitted that the events were fresher in his mind when he was interviewed by the police, and he could not remember what he said to them. He might have been confused when he spoke to the police but he tried to tell the truth. [Ricky] remembered that he testified at the preliminary hearing, but he could not remember what he said. [Ricky] was impeached with his preliminary hearing testimony that Raheem only participated in the first assault on Escareno and was not present for the subsequent assaults, but that [petitioner] was present for all the assaults.

"[Ricky] testified that he was initially too scared to get involved in the case because his family lived in the neighborhood, but insisted he was telling the truth, his testimony was not intended to harm the Muhammad family, and it was not in retribution for his prior drug convictions.

"There were several other witnesses who were present and observed various aspects of the robbery and murder. Anthony . . . testified that he was at his mother's house with Ricky . . . , and they used crack cocaine and drank alcohol that day. [Anthony] testified he did not remember anything about the assault on Escareno. When he first saw Escareno walking down the street, he appeared unharmed. [Anthony] went inside his house to use the bathroom. When he returned to the porch, he saw an old man l[]ying on the street next to the curb.

"[Anthony] testified he was diagnosed with schizophrenia and had taken psychiatric medications for 31 years because he heard voices and saw shadows. The medications affected his ability to understand and remember. He gave a statement to the police at the time of the homicide, but he could not remember what he said. [Anthony] admitted he was addicted to cocaine, he had prior convictions for selling or furnishing narcotics, and he was on parole for possession of cocaine.

9.

"Estelle . . . testified she was driving back to her house when she noticed 'quite a few' Muhammads standing on the corner of Walnut and Garrett Streets. There were about eight to 10 people between the ages of 10 and 18 years. She did not know their names but recognized their faces. She knew that some of the Muhammad children lived with their grandmother on Garrett Street. They were just standing there and no one was running away. At trial, [Estelle] testified she recognized [petitioner] and Raheem from the neighborhood, and also some of the Muhammad family members who were present in the courtroom during the instant case.

"[Estelle] parked at her house and [Anthony], her son, said that a man had been jumped, and asked her to call the police. [Anthony] was excited and trying to tell her what happened.[9] [Anthony] told [Estelle], ' "Muhammad jumped on a man." ' [Estelle] saw a body l[]ying in the street by the curb. She did not approach the body and no one was standing around it, but the Muhammad group seemed to be looking at the body. [Estelle] immediately called 911 but she could not get through. [Estelle] was still trying to call 911 when her family called out that the police had arrived in the neighborhood. [Estelle] looked outside and saw the police were there.

"Lionel [A.] lived in the area and was familiar with the Muhammad family, and did not have a good opinion of them. [Lionel's] brother had some dealings with the Muhammad family, and previously warned [Lionel], ' "Watch out for when they run in a group because they'll all—they'll all get you." ' [Lionel] had never been attacked by members of the Muhammad family, 'but there is always opportunity.' [Lionel] had prior misdemeanor convictions for domestic violence and assault in 1995. [Lionel] testified he did not want to be involved in this case.

---

9 "[Estelle] testified that [Anthony] was on medication because '[h]e sees things I don't see' and he had difficulty perceiving things around him."

10.

"[Lionel] testified he was walking toward the market when he stopped at the corner of Walnut and Garrett and saw eight to 12 African-American youths running around the corner, 'kind of like they were in a snake, all following one person.' [Lionel] testified they ran away from him down Walnut, turned on Garrett, and headed toward a house on Garrett where the Muhammads lived.

"[Lionel] continued toward the market but stopped at Estelle['s] house, where he saw Ricky . . . and Leroy . . . . He asked [Ricky] what was going on. '. . . I wanted to see – make a decision in my direction if I was going to continue to go to the store and get trapped on the other side or return home, so at that point I – I decided to just wait – wait it out.' An old man was sitting on the curb across the street. [Ricky] pointed toward the old man and said: ' "Muhammads just got done beating up this bum." ' [Ricky] also said that some of the Muhammads did not live on Garrett Street but had gathered there. [Ricky] did not specify any individuals by name. [Ricky] might have said 'that they robbed him or something of that sort, but I'm not actually 100 percent sure.' [Lionel] testified [Ricky] 'was a little emotional and everybody was upset that was there.'

"[Lionel] testified the man on the curb stood up and tried to walk away but staggered and stumbled. He was hunched over but able to walk, and seemed to head for the market. [Lionel] testified that he did not think the man needed help because he was standing up and walking around. [Lionel] knew the man had been attacked and conceded he 'didn't seem to be okay, but he was moving and I wasn't going to cross the street to find out his condition, but he was moving. So, that was good enough for me.'

"[Lionel] testified that he knew Escareno very well but he did not realize the man in the street was Escareno because the man's head was down and in his hands, and his back was turned as he walked away from [Lionel]. [Lionel] insisted that he would have helped the man if he had realized he was Escareno. 'I wasn't considering helping that individual because I didn't know him. That's number one. Unless he was really down

11.

and hurt. My consideration was for myself. To make sure that I got out of the area because I already knew – what was going on.'

> " 'Q If he had seemed to be seriously hurt, you would have come to his assistance, yes? [¶] . . . [¶]

> " '[A] It would depend. If I knew it was him, I would defended him. [¶] . . . [¶] That's just the point. If I knew it was him. It was a different individual, then, that's a whole different thing. I would have to consider who, how many, what options do I have to defend that person. . . .'

"[Lionel] testified he did not go to the market or stay around the area. Instead, he walked back to his house and did not see anything else.

"Norwood [M.] was walking to the store when he saw a 'hump' in the street. He approached and discovered the 'hump' was a man, who was bleeding as if he had been hit by a car. [Norwood] knew the Muhammads, but he did not see any family members or anyone else on the street at that time. [Norwood] stood next to the man until the police arrived.[10]

"**The Initial Investigation**

"At 5:58 p.m., Fresno Police Officer [E.] Mendizabal responded to the area of Walnut and Garrett Streets and found Escareno l[]ying in the street, about three feet from the curb. A Black male adult was standing with Escareno when the police arrived. Escareno was l[]ying on his back. He was alive but unconscious and having trouble breathing. He was moaning and bleeding from the left temple. The officer tried to open his airway, and applied pressure to stop the bleeding on the left side of the head.

---

**10** ". . . [Norwood] had previously been attacked by a member of the Muhammad family. At trial, [Norwood] admitted that he previously had a dispute with F.K.M. about repairing his car, and F.K.M. hit his head with a pipe. Another member of the Muhammad family took [Norwood] to the hospital after that incident. [Norwood] needed 16 to 17 stitches but never reported the assault. Neither Raheem nor [petitioner] were involved in the pipe incident."

"Escareno was wearing a trench coat which was still fastened. Officer Mendizabal opened the coat to look for other injuries. After he opened the coat, Mendizabal observed the right pocket of the man's pants was turned out halfway. There were about three to seven loose coins inside the man's trench coat by the right pocket. Escareno's hand was cupped into a fist and made in-and-out motions, as if he was trying to place his hand in the right pocket. As the officer and paramedics rendered aid, they cut off his clothes and the coins fell from the inside of the coat onto the street. The officers found a wallet in his front pocket which contained $407 in cash; $120 in cash was in his right front pants pocket. A handkerchief in his left bank [*sic*] pants pocket contained Mexican coins and $5.15.

"The paramedics determined Escareno suffered blunt trauma to the head, a laceration on the left side of the head above the ear, and a large bruise above the right ear. Escareno was transported to [a hospital], where he died at 10:43 p.m. that night.

"There were blood drops on the sidewalk near the bus stop, a small puddle of blood on the sidewalk's dirt strip, blood smears on the cement curb, blood drops on the street, a penny and a nickel in the street, a penny by the curb cutout, a penny and a nickel near the corner, and a pool of blood near the corner.

"That same night, the officers found a pair of orange 'Mongoose' bicycle gloves in a trash can next to the Muhammad's residence on East Garrett. It was stipulated the gloves belonged to H.M., and that DNA analysis showed Escareno's blood was on the gloves.

"As the officers investigated the homicide, they also learned about the assault on [Jose] and [Ricardo] on December 8, 2000, and pursued that investigation.

"**The Pathologist's Testimony**

"Dr. [T.] Glauser, the pathologist who conducted the autopsy, testified regarding the fatal injuries suffered by Escareno. There were significant blunt force injuries to the head, bruises on both sides of his face, abrasions above the eyebrows and left temple,

13.

abrasions by the mouth and nose, and bruises around the eyes. There were large areas of bleeding under the scalp. The bleeding was significant enough to result in a subdural hematoma which pushed the left side of the brain down and over toward the right side of the scalp.

"Escareno suffered lacerations to the left eyebrow, just outside the left eyebrow, and the left temporal region, all of which were within an inch of each other, and bleeding in the left upper eyelid and the left side of the frontal scalp in the forehead region. There were contusions on the right upper eyelid, right cheek, right temple, and right sides of the nose and mouth. He suffered a fractured skull on the left front side, which could have resulted from either being hit hard on the left side or falling down on his left side.

"Escareno also suffered three fractured ribs on the left side, and a bruise on the upper lobe of the left lung. There was blood in the surrounding soft tissue of the lung. The rib fractures were consistent with blunt force trauma or being kicked in the ribs. There were smaller bruises on the left hip, and contusions on both hands which were consistent with defensive wounds.

"Dr. Glauser testified Escareno's cause of death was a subdural hematoma caused by the blunt force head injuries, but he could not determine which particular blunt force trauma caused the subdural hematoma. The inner cranial area filled with blood and increased cranial pressure against the brain. The injuries were consistent with the victim being brutally assaulted. The subdural hematoma was only on the left side, above the brain, which caused the pressure effect to move the brain from the left to right side. There were superficial injuries on both sides on the skin, but only bleeding on the left side.

"Dr. Glauser explained he could not differentiate between the injuries inflicted through the series of assaults 'because both sets of injuries and falls were in such close proximity that I don't think that you can say that one definitely didn't do it and one definitely did do it. I think they probably both contributed. I think there is no way that

14.

you can say that, you know, just the first attack caused bleeding, but the second attack didn't.' There was nothing to suggest that the first set of blows did not set in motion the subdural hematoma that ultimately led to his death. Dr. Glauser agreed with his testimony from a prior proceeding, that it was possible the victim could have survived, absent the final blow, because the victim stood up and walked around after the first set of blows. Dr. Glauser did not know how likely such a scenario was however, but conceded it was possible. He explained it was impossible to determine the sequence in which the victim suffered the various head injuries because the blows were inflicted so close in time and within a matter of minutes, as opposed to being inflicted a few days apart. In an elderly person, either a trivial punch or a trivial fall could cause a subdural hematoma and a single punch could inflict a fatal head injury.

"Dr. Glauser also explained the subdural hematoma indicated the victim suffered a deceleration injury to the brain, when the brain and head are moving quickly but the head stops before the brain movement stops. The bridging blood vessels in the brain broke during the infliction of the blows, or when the victim's head hit the pavement. The blood collected between the brain and the inner surface of the skull, and basically pushed on the brain.

"Dr. Glauser explained the nature of deceleration injuries to the brain. As the head falls toward the pavement, the brain lags behind a little in speed because it is sitting in a fluid. As the head begins to stop, the brain is not in direct contact with the head so the brain still carries the forward momentum it had while the head was still moving. When the head stops moving, it has gone into negative acceleration, but the brain is still going at the same acceleration until it catches up and moves within the cranial cavity. As a result, the bridging veins stretch, tear, and bleed.

" 'Q  And it is possible that the earlier blows without the final blow might not have caused death?

15.

" 'A  Again, I don't think it is very likely.  Can I say absolutely 100 percent?  No.  No, I can't say that.  But I think it is unlikely that the first set of blows did not start something that it was only the final blow.

" 'Q  Well, we deal with reasonable doubt in this case not likelihood, so your answer would be that it is possible?

" 'A  I don't think it is reasonable, no.'

"Dr. Glauser was impeached with his testimony at a prior juvenile proceeding, when he said it was possible the earlier blows might not have been fatal by themselves. Dr. Glauser explained:  'Distinct possibility versus legal reasonable.  And if you ask me if it is possible, then I would agree with my answer from before.'  The pathologist conceded that any one of the blows could have caused the death, and just because a blow caused a contusion or unconsciousness, it did not necessarily mean it also caused a subdural hematoma.  He could not tell with absolute certainty which blow caused, or was more likely to cause, the subdural hematoma.

"**The Homicide Investigation**

"At trial, the prosecution introduced the prior statements of the witnesses made during the investigation, which were somewhat inconsistent with their trial testimony.

"*Ricky['s] statements*

"Around 3:00 p.m. on December 18, 2000, the day after the homicide, Detective Von Euw conducted a videotaped interview with Ricky . . . .  [Ricky] appeared coherent and there were no obvious signs of intoxication.  He gave statements about the assaults on both [Jose] and Escareno.  [Ricky] said Raheem was present during the first assault on Escareno but not during the final assault.  [Ricky] also stated that S.M. threw the final punch at Escareno.

"On December 20, 2000, [Ricky] was interviewed again, and stated that someone told him that H.M. threw the final punch at Escareno.  [Ricky] stated he made a mistake and confused S.M. and H.M. because they looked alike, and that S.M. was not there. Detective Von Euw testified:  '[Ricky] made an identification.  He was told a couple days

16.

later that he was wrong. And he brought that to my attention. I – I thought that – that was a good thing he did that because it kind of showed me he did not want to make a mistake. He didn't want to see somebody innocent get blamed for something that somebody else did and he wasn't sure.' [Ricky] did not initially disclose, however, that he used crack cocaine that day. [Ricky] never said that Raheem threw the final punch at Escareno.

"On December 29, 2000, just a week after the homicide, an investigator from the prosecutor's office spoke with Ricky . . . about relocating him because of safety concerns. During this exchange, [Ricky] voluntarily disclosed additional details about the assault on Escareno. [Ricky] stated he was sitting on [Estelle's] front porch when he saw Escareno waiting at the bus stop. [Ricky] stated three people approached Escareno: M.M., Raheem, and C.A. [Ricky] stated they talked to Escareno, and then Raheem hit Escareno's face with his fist. Escareno yelled for help and Raheem hit him again. M.M. and C.A. kicked the victim and Raheem hit him. M.M. asked Escareno, ' "That fool came up, how much you got?" ' Raheem began searching Escareno's pockets, and then all three subjects left the area on foot.

"[Ricky] stated that about three or four minutes later, the same three people returned and helped Escareno sit on the curb. Escareno stood up and walked to the corner of Walnut and Garrett Streets. [Ricky] stated that another subject known as 'Yack' arrived, accompanied by C.A., M.M., H.M., and four or five younger kids. [Ricky] did not say that Raheem was with this group. [Petitioner] yelled at Escareno to leave the area, and Escareno turned around and walked away. [Petitioner] came up behind Escareno and attacked him. Escareno fell to the ground, and all the subjects ran from the area.

"***Anthony['s] statements***

"At noon on December 18, 2000, Detectives Alcorn and Von Euw conducted a videotaped interview [of] Anthony . . . . He appeared fine during the interview but

17.

became emotional as he described the assault. [Anthony] stated the Muhammads were involved in the assault, but he did not name any specific individuals.

"A few days after the homicide, Detective Alcorn interviewed Estelle . . . , who stated that she was driving home when she saw Escareno's body in the street. There were about eight to 10 African-American males standing around him, and their ages ranged from 10 to 18 years old. She did not see anyone hitting or kicking Escareno but he appeared to be injured. She went into the house and called 911. [Estelle] reviewed several photographic lineups and identified [petitioner], Raheem, and S.M. as part of the group that surrounded the man. [Estelle] did not say anything about whether her son, Anthony . . . , wanted to intervene, or that she told him not to get involved.

"In January 2001, a prosecution investigator interviewed [Anthony] about the homicide. [Anthony] did not have any difficulty recalling any of the events, and the information flowed 'pretty freely' as they talked about the incident. [Anthony] stated he lived at his mother's house, across the street from the market. He did not know Escareno's name but identified his photograph as the elderly gentleman who was assaulted. [Anthony] knew Escareno as a very nice man who lived around the corner.

"[Anthony] stated he was on the front porch with Ricky . . . when he saw Escareno walking down Walnut Street. Escareno stopped at the corner and seemed to look down Garrett Street. [Anthony] asked if [Ricky] knew the man and [Ricky] said no. As Escareno stood at the corner, he was approached by six or seven 'little kids,' but one was notably 'bigger' than the rest. One kid yelled, ' "Man, you the police or what? Get the fuck out of here. You get on." ' Escareno did not respond but he turned around and headed toward the market. One of the kids hit Escareno, and then the rest of the group assaulted him and he fell to the pavement. The group surrounded Escareno and cussed, punched, and kicked him as he lay on the ground. At some point, the group ended the assault, walked back to Garrett Street, and left the area.

18.

"[Anthony] stated Escareno remained on the street and did not move. After about five to 10 minutes, [Anthony] approached to see if he could help him. Escareno was lying 'kind of twisted' on his left-hand side. He was bleeding on the left side of his forehead, and there was blood on the pavement beneath his head. [Anthony] tried to speak to Escareno but he did not respond, and [Anthony] shouted for someone to call an ambulance. However, Escareno regained consciousness and sat up. Escareno started to walk away normally as if nothing happened. [Anthony] returned to the front porch and rejoined Ricky . . . .

"[Anthony] stated that Escareno walked back to the corner of Walnut and Garrett, and some of the same individuals came at him a second time and 'jumped' him again. [Anthony] thought there were fewer people in the group this time, perhaps six or seven individuals, but these people had participated in the first assault. Escareno did not fight back and fell to the ground, and some of the attackers told him to get up. Some of them also yelled to [Anthony] to ' "come get your friend," ' and then they ran down Garrett Street.

"[Anthony] stated he walked off the porch and headed toward Escareno. He intended to 'beat their little asses and that he was hot. Meaning, angry.' His mother, Estelle . . . , intervened and told him: ' "Stop. You are on parole. You can't get in trouble . . . . Get back in the house." ' [Anthony] obeyed his mother and remained in the driveway, but he was angry about observing the incident and not being able to do something about it. He paced around the driveway and became emotional. [Anthony] stated that Norwood . . . arrived in the area, approached Escareno, and stayed with him until the police arrived.

"[Anthony] stated the attackers were 'the Muhammads' but he did not know their first names. He was more familiar with the adult members of the family, but the 'youngsters' assaulted the old man. He did not know Raheem or [petitioner]. It was too dark to see the faces of the assailants. [Anthony] thought it was unusual for Escareno to

19.

walk around the neighborhood that late in the evening. [Anthony] believed the two attacks occurred 15 minutes apart.

"***Additional pretrial statements***

"Around 2:00 a.m. on December 18, 2000, just hours after the homicide, Detective Von Euw interviewed Lionel . . . at his house. [Lionel] was very hesitant to talk to the officers, and said he did not see anything except for people running away. [Lionel] looked at photographic lineups and identified Raheem as one of the people who ran away from Escareno. Von Euw again interviewed [Lionel] around 8:00 p.m. on December 18, 2000. [Lionel] was very nervous and scared. [Lionel] stated he had been contacted by a member of the Muhammad family, and he did not want to be involved.

"In July 2001, a prosecution investigator interviewed [Lionel]. [Lionel] stated he walked 'into the middle of this matter' and asked Ricky . . . what was going on. [Ricky] told [Lionel] that ' "they beat up that bum right there." ' [Ricky] did not say anything about a robbery or theft. [Lionel] stated that Escareno stood up from the curb and stumbled. He regained his footing and walked away from the bus stop. [Lionel] could not tell if Escareno was injured or bleeding because his back was to [Lionel].

"***Pretrial statements of Raheem and C.A.***

"On December 20, 2000, Detectives Alcorn and Von Euw conducted a sequence of interviews with Raheem and C.A. They were interviewed separately, then allowed to speak with each other, and then Raheem was interviewed again. These interviews were tape-recorded, with the exception of Detective Von Euw's first interview with C.A. The court granted [petitioner and Raheem's] motions to redact various portions of these recordings. The redacted recordings were played for the jury, and redacted transcripts were introduced into evidence.

20.

"According to the redacted transcript, Detective Von Euw advised Raheem of the *Miranda*[11] warnings. Raheem stated he understood his rights and would answer questions. Von Euw advised Raheem that he was investigating the robbery and assault on the two men by the market, and the homicide of Escareno. Raheem stated he was not involved in either incident. Detective Alcorn replied there were witnesses who said he was present at both assaults. . . .

"Detective Von Euw asked Raheem about the incident where the old man was assaulted. Von Euw explained the old man was assaulted two separate times, he was alive after the first assault, but he died after the second assault. Raheem repeatedly said he was not there, he did not know anything about the assault, and that he was watching a football game at his girlfriend's house that day. Von Euw said that he would have an officer contact the girlfriend to confirm the alibi, and they took a break.

"Detective Von Euw testified that during the break, another officer contacted O.S., Raheem's girlfriend, and she denied Raheem was with her that evening.

"Thereafter, Detective Von Euw interviewed C.A. in a room in which the recording equipment was not working; [another officer] was present during the interview as a witness. At the same time, Detective Alcorn began an interview with S.M. in the larger interview room which was equipped with operable recording equipment.

"Detective Von Euw testified that C.A. was 12 years old at the time. C.A. initially denied any involvement in the assault on Escareno. Von Euw told C.A. they had talked to Raheem, and they knew Raheem had hit the victim. C.A. continued to deny he was there but, after about five minutes, he admitted he was there. C.A. stated the old man had come close to where they were playing football, and touched one of the cousins. C.A. stated he was present during the first assault on Escareno. He threw the first punch at Escareno but the victim did not fall down. C.A. stated that Raheem delivered the second

---

**11** *Miranda v. Arizona* (1966) 384 U.S. 436.

21.

punch and knocked down the victim. C.A. claimed he walked away and left the scene at that point.

"Detective Von Euw told C.A. that the same witnesses stated that several people attacked the victim. C.A. stated that four or five other people also hit and kicked the old man. C.A. stated that [petitioner] was there but he just watched and did not hit or kick the victim. C.A. also said that [petitioner] took some of the victim's change from him. C.A. stated that M.M. and [B.M.] were also there.

"Detective Von Euw asked C.A. which people hit or kicked the victim. C.A. stated that M.M. and [B.M.] kicked the victim. Raheem kicked the victim after he knocked him to the ground. C.A. also hit or kicked the victim. C.A. stated that once the victim was on the ground, the victim reached into his own pockets and the change fell out. C.A. and [petitioner] took some of the change from the victim.

"C.A. stated the first assault lasted about 15 seconds, and they all walked back to his grandmother's house on East Garrett. The 'bigger kids' left and the 'smaller kids' played basketball in the backyard.

"Detective Von Euw testified he stopped the interview at this point, and determined the larger interview room with the recording equipment was now available. Von Euw moved C.A. into the larger room and conducted a videotaped interview, and went over what C.A. already said.

"According to the redacted transcript of the recorded interview, Von Euw reminded C.A. of the *Miranda* warnings and summarized their earlier conversation. C.A. stated he was playing football with his cousins when the old man walked down their street. One of his cousins said the old man tried to grab him. C.A. walked up to the old man and tried to talk to him, but the old man kept walking. Raheem also tried to . . . talk to the old man, but the old man continued to walk away from them. C.A. hit the old man one time but he kept walking and did not fall down. Raheem hit the old man and he fell, and the 'little kids' kicked him. Raheem did not kick him when he was on the ground.

22.

C.A. stated that [petitioner] (Yacky) did not do anything and just watched. [Petitioner] told them to be cool and chill out because the man was old, and they left him alone. No one had rags around their hands. C.A. claimed the old man put his hands in his pockets and change fell out. C.A. and [petitioner] picked up some change. C.A. retrieved 55 cents and bought a soda at the market. C.A. stated he went back to his grandmother's house with the younger children to play basketball and color, and he did not know the older boys returned to the street.

"C.A. stated he later went outside and saw the old man l[]ying in the street. C.A. was not there for the second assault, and he did not know who was involved. C.A. noticed more change on the ground but did not pick it up because the police were there. C.A. acknowledged that he saw Detective Von Euw that night and gave a false name. Von Euw asked why C.A. gave a false name to him that night, and C.A. admitted he was afraid he would get into trouble. C.A. stated that H.M. was not present for the first assault. C.A. also said that during the first assault, one of them called out to [Anthony] to get his friend.

"After Detective Von Euw conducted the videotaped interview with C.A., he brought Raheem into the same interview room with C.A. Von Euw told Raheem that his girlfriend did not support his alibi, and advised him to talk to his cousin, C.A. Von Euw left C.A. and Raheem alone in the room but monitored their conversation through the videotape camera, which was still running. Raheem and C.A. were not advised the videotape camera was still running, but Raheem seemed suspicious that they were being watched.

"According to the transcript, Raheem immediately asked C.A. what Von Euw said about him. C.A. recounted their conversation, and that Von Euw wanted to know if Raheem hit or kicked the old man, what [petitioner] did, and if they went through his pockets. Von Euw said that Raheem already said that he hit the old man. C.A. admitted he said that Raheem hit the old man, but that Raheem did not go through his pockets.

23.

C.A. said that Von Euw wanted to know who was involved in the second assault, and that C.A. claimed he did not know.

"Raheem told C.A. that he should have said 'there was a bunch of people right there.' C.A. said he tried to, but Von Euw made him get confused and claimed Raheem already admitted he was there. Raheem replied: 'Well, I'll tell him (inaudible), then he stumbled, then I hit him and he fell and went back.' C.A. added that he already said that, and that Raheem left and someone else went through his pockets.

"C.A. also told Raheem that he claimed the old man tried to grab one of the cousins, that C.A. told Raheem about the incident, and they tried to talk to the old man and then hit him. Raheem said he told Von Euw that he was not even there, and he was at his girlfriend's house. Raheem also told C.A. that he 'only hit the dude one time, and you hit him.' C.A. added that Von Euw wanted to know who assaulted the old man the second time. Raheem said, 'I'm fixing to tell him the whole story when he come in, man.' Raheem also told C.A. to 'just say some people came' and not give any names. C.A. replied that Von Euw 'already told me all the names that was there.'

"Raheem thought they were 'gonna try and stick me and you with that shit. Shit, I only hit that dude one time.' C.A. replied that Von Euw said that whoever hit the old man the first time probably did not kill him because he got up and started walking, but he wanted to know who hit the old man the second time because they killed him.

"At this point, Detectives Alcorn and Von Euw returned to the interview room and spoke to both Raheem and C.A[.] They advised the cousins that S.M., Willie, and F.K.M. were in custody, and 'we're pickin' everybody else up.' Von Euw added that Raheem's girlfriend did not support his alibi, and asked Raheem if he wanted to explain things.

"Raheem proceeded to give a statement about the assault on Escareno. Raheem said they were playing football and one of his little cousins said that some dude tried to grab and kidnap him. Raheem and C.A. approached the man and asked why he was

24.

trying to grab the kids. The man did not respond. C.A. hit the man and he stumbled, and Raheem hit the man and he fell down. The man sat up on the curb, and C.A. and Raheem returned to their grandmother's house. C.A. said the man was leaving. C.A. later said some other people beat up the man. Raheem claimed the little kids went through the man's pockets, and Raheem told them to leave him alone.

"Raheem admitted he hit the man the first time, and said it was just a bunch of kids who committed the second assault. He did not know who was involved because he did not go back but C.A. went back and knew who was involved. C.A. was still present in the interview room, and said H.M. hit the man during the second assault. Raheem added that he only hit the man one time, and then he left and did not see anything else. C.A. said that H.M. was wearing the orange gloves which Von Euw found in the trash can. C.A. was subsequently removed from the room but the officers continued the interview with Raheem.

"Detective Alcorn asked Raheem if the man said anything to them. Raheem again claimed the man acted like he was going to grab his cousin. C.A. delivered the first punch and then Raheem hit him, and the man fell down. The man sat on the curb and the change fell from his pockets. Alcorn asked why they hit him, and Raheem again said the man tried to grab his cousin. 'Plus, he had on a jacket, too, so I couldn't really tell who he was.' Raheem later found out he was an 'old dude,' and asked everyone why they claimed the old man tried to kidnap someone. Detective Alcorn asked Raheem why he lied during the first interview. Raheem said he did not want to get into trouble because he hit the man the first time, but he 'didn't do all that to him.' [¶] . . . [¶]

"Detective Alcorn ended the interview by asking why everyone in the neighborhood was so frightened of them. Raheem replied it was because 'we be takin' up for each other sometimes if we havin' a problem with people or somethin'.'

"***[Petitioner]'s pretrial statements***

"On January 8, 2001, [petitioner] and H.M. were arrested in Portland, Oregon; M.H. was taken into custody with them but he was not arrested. The detectives from the Fresno Police Department participated in the arrest. That same day, the Fresno detectives conducted a tape-recorded interview with [petitioner] in Portland. The tape recording of that interview was played to the jury.

"According to the redacted transcript,[12 petitioner] initially stated that he was playing football with his cousins and saw the old man walking on the street. He later saw the man l[]ying on the ground. [Petitioner] claimed he did not know what happened to him. Detective Von Euw replied that C.A. told them about the incident, and they took change from the old man. [Petitioner] said that C.A. took the change and gave it to him. [Petitioner] insisted he did not do anything to the old man, but admitted he was there when the man was knocked to the ground and C.A. went through his pockets. [¶] . . . [¶]

"Detective Von Euw told [petitioner] his story was not believable, and that C.A. told them what happened. [Petitioner] admitted he saw the old man being kicked on the ground, but insisted he did not go through his pockets and C.A. gave him the money. Von Euw again said that [petitioner] would not snitch off anyone because 'everybody's already told me.' Von Euw also said C.A. told them who was wearing the bloody orange gloves. [Petitioner] said that F.K.M. was talking to the old man before the assault, and the little kids were outside playing football. A couple of the little gangs, 'like a gang of them,' followed the old man. [Petitioner] walked up and saw the old man on the ground. He was trying to sit up but he was still being kicked by the '[l]ittle ones.' [Petitioner] did not know who threw the last punch or wore the orange gloves. C.A. told [petitioner] who

---

**12** "At the beginning of this interview, [petitioner] was advised of the *Miranda* warnings. . . ."

26.

was wearing the gloves, but [petitioner] refused to say. [Petitioner] finally said the gloves belonged to H.M., but then said he did not know.

"[Petitioner] again said they were playing football and the old man walked by them. Some of the cousins followed the man around the corner. When [petitioner] walked around the corner, the old man was already l[]ying on the ground and people were still kicking him. C.A. took money from the man's pockets and gave it to [petitioner]. [Petitioner] refused to say who threw the last punch." (*Muhammad*, *supra*, F043303.)

In addition to the foregoing, "the prosecution called C.A. as a witness. He had already been the subject of a juvenile adjudication for the homicide of Escareno, and the trial court granted him immunity in the instant proceeding because his appeal was still pending.

"Despite the grant of immunity, C.A. was an extremely reluctant witness and testified he did not remember anything about the incident or anything he told the police. C.A. admitted that Raheem and [petitioner] were his cousins, and they frequently visited the neighborhood. C.A. also admitted that he previously told the police that [petitioner] did not do anything, and [petitioner] told the others to chill out and leave the man alone. C.A. testified that Raheem and H.M. did not kill Escareno.

" 'Q Who did kill Mr. Escareno?

" 'A I don't know. Y'all got me, so I must be the one.

" 'Q We got you here as a witnesses [*sic*]?

" 'A No, you got me locked up, so I must be the one.

" 'Q Are you saying that you killed Mr. Escareno?

" 'A I'm here. I'm locked up for it.'

"The court admonished the jury there was no evidence as to what the charges were against C.A. and not to consider the issue." (*Muhammad*, *supra*, F043303.)

27.

**Defense Evidence**

A defense witness for Raheem opined as to the mechanism of Escareno's injuries and cause of death, and opined that the injuries occurred after the second assault, when Escareno fell to the pavement. However, he conceded the first assault may have been a substantial factor in Escareno's death. (*Muhammad*, *supra*, F043303.)

Additionally, "Detective [A.] Rodriguez testified as a defense witness for [petitioner]. He arrived at the scene of the Escareno homicide investigation around 9:20 p.m., and observed a streetlight on the northeast corner of Walnut and Garrett, which produced enough light to illuminate a 35 to 40 foot radius. There was also a streetlight on the southwest corner of Walnut and Garrett, but it was not working at the time. There were lights on top of the market which illuminated the entire parking lot, a portion of the street, and the bus stop. Detective Rodriguez did not have any difficulty seeing the faces of other officers in the area.

"Detective Rodriguez found a penny and a nickel in the road near the bus stop, a nickel closer to the curb, and a penny near the southeast corner of Walnut and Garrett. There was a pool of blood near the corner of Walnut and Garrett, blood on the adjoining sidewalk, a puddle of blood on the dirt strip, and a blood smear on the curb line.

"Ethelene Muhammad, [petitioner's] mother, also testified as a defense witness. She had been married to one of the sons of James and Evelyn Muhammad, but they were now divorced. Ethelene had 13 children, including [petitioner] and Willie; Raheem was their cousin. Ethelene had a 1979 misdemeanor conviction for welfare fraud. Her husband had been convicted of a drug-related offense. She had been the victim of domestic violence but did not report the incident because she loved her husband. Willie had been convicted of robbery in connection with this case. [Petitioner's] childhood nickname was 'Yacky.' [Petitioner] lived with his mother on A Street at the time of his arrest, but he used to go to his grandmother's house on East Garrett to take the bus to and from high school. Ethelene did not like [petitioner] and her other children to visit the

28.

grandmother's house on East Garrett 'because little kids out there are bad. They play in the streets.' The younger children were a 'menace' when they visited their grandmother's house because they regularly rode their bicycles in the middle of Garrett Street. She denied saying that the kids were known to terrorize the people in that area or that people get beat up there." (*Muhammad*, *supra*, F043303.) Ethelene also testified she was unaware of gang activity in the Muhammad family. (*Ibid*.)

"A defense investigator, called as a witness for Raheem, testified about a statement she obtained from Anthony . . . in May 2001, about Escareno's death. [Anthony] stated he was sitting on the porch with Ricky . . . and drinking beer. Someone walked by but he did not recognize the person. [Anthony] asked [Ricky] who the person was, and [Ricky] said it was an old man. The man had walked from the corner of Walnut and Garrett toward the bus stop, which was directly across the street from [Anthony's] house. The man looked toward Garrett Street. A small group of young African-American boys approached the man and started to yell at him; they asked if he was a cop, what was he doing around there, and to get out of there. The boys hit the old man and knocked him to the curb, and they walked away.

"[Anthony] stated the man was l[]ying on the curb near the bus stop. [Anthony] walked across the street to check on him, and the man sat up. There was blood running down the side of his face, from the temple, and a pool of blood on the street where his head had been l[]ying. [Anthony] asked the man if he was okay. The man looked at [Anthony] and sat on the curb, but he did not respond. [Anthony] called out that someone should call the paramedics, and returned to the porch.

"[Anthony] stated the man stood up and walked toward Garrett Street. He seemed to walk normally and did not weave around or stumble. [Anthony] returned to his conversation with [Ricky]. The next thing he heard was a moaning sound. [Anthony] looked up and saw the old man sitting on the curb near the corner of Walnut and Garrett.

29.

Some young African-American males were walking away toward the Muhammad house, and [Anthony] believed the man had been assaulted again.

"[Anthony] stated he continued his conversation with [Ricky]. When he looked up, the man was l[]ying in the street, and [Anthony] assumed he had been assaulted again. [Anthony] wanted to help the man but his mother told him not to get involved. Instead, his friend Norwood . . . went over and checked on the man. [Norwood] returned to the house and reported there was a hole on the side of the man's head, and blood was dripping on the ground. [Anthony] stated that he could not identify any of the assailants but he thought they were the Muhammads. [Anthony] stated he was on parole for selling cocaine.

"Raheem also introduced the prior testimony of Ricky . . . from the preliminary hearing. [Ricky] testified at the preliminary hearing that Raheem used his right fist to punch Escareno in the left cheek. [Ricky] also testified that Raheem was present when the group helped Escareno sit up on the curb. Raheem was not present during the third encounter and final assault, and [petitioner], C.A., H.M., M.M., and other 'little kids' were there." (*Muhammad*, *supra*, F043303.)

## Rebuttal Evidence

The prosecution presented rebuttal evidence from a forensic examiner who would not differentiate whether the first or second assault caused Escareno's fatal injuries. "Also in rebuttal, Detective Von Euw testified that on February 6, 2001, Ethelene Muhammad called and wanted to speak with him, and he went to see her that same day. Ethelene said that she talked with her son, [petitioner], and he identified who was involved in the robbery of December 8, 2000. She did not deny that Willie and [petitioner] were involved in a gang, and she said 'this is where they found their love.' She said that Willie and [petitioner] liked to hang out at their grandmother's house on East Garrett Street. She did not want them there because 'that is where they got in trouble.' She said the kids beat up people, she had seen people walk on the other side of

the street so they would not get beaten, and their grandmother was aware of this.  She
said the Muhammads protect their own.

"Detective Von Euw again testified that Ricky . . . initially stated that H.M.
inflicted the final punch on Escareno; two days later, [Ricky] stated that it was S.M.
[Ricky] also identified Raheem as being involved in the assault on Escareno."
(*Muhammad*, *supra*, F043303.)

## PROCEDURAL HISTORY

### I.     Underlying Convictions and Sentence

In 2003, a jury convicted petitioner of the second degree murder of Escareno
(§ 187, subd. (a); count 1), as well as second degree robbery (§ 211; count 2) and simple
assault (§ 240; count 3) arising out of the separate incident involving Jose and Ricardo.
As to count 2, the jury found true a great bodily injury enhancement (§ 12022.7,
subd. (a)).  As to all counts, the jury found gang enhancements to be true (§ 186.22,
subd. (b)(1)).[13]  (*Muhammad*, *supra*, F043303.)  The trial court sentenced petitioner to a

---

[13] Petitioner had been charged with first degree murder and a robbery-murder
special circumstance on count 1, and assault by means of force likely to produce great
bodily injury on count 3.  (*Muhammad*, *supra*, F043303.)

Raheem was convicted of the first degree murder of Escareno with a robbery
special circumstance, robbery of Jose with a great bodily injury enhancement, and simple
assault of Hernandez, all with gang enhancements.  (*Muhammad*, *supra*, F043303.)

"Willie, Ibrahim, Kevin, F.K.M., S.M., H.M., and M.H. were subsequently
convicted of robbery with gang enhancements, and Kevin was convicted of threatening
the witnesses with gang enhancements.

"A separate juvenile proceeding was brought against C.A. and M.M.  At the time
of the homicide, C.A. was 12 years old and M.M. was 10 years old.  As to C.A., the court
found true the allegations of first degree murder of Escareno, with the robbery special
circumstance.  He was committed to the California Youth Authority (CYA) [an agency
whose responsibilities were transferred to the Division of Juvenile Justice (see *People v.
Superior Court (Lara)* (2018) 4 Cal.5th 299, 306), and later to the Office of Youth and
Community Restoration (see Gov. Code, § 12803; Stats. 2020, ch. 337, Sen. Bill No. 823
(2019-2020 Reg. Sess.); see also Welf. & Inst. Code, § 2200 et. seq.),] until the age of 25,

31.

term of 15 years to life for the murder, plus an additional 10 years for the determinate terms and enhancements. (*Ibid.*)

On appeal, this court struck the gang enhancement to count 1, modified the term of the gang enhancement to count 2, and directed the trial court to prepare corrected abstracts of judgment. We otherwise affirmed. (*Muhammad*, *supra*, F043303.)

## II.     The Petition for Resentencing

On January 7, 2019, petitioner filed a petition for resentencing pursuant to section 1172.6. The People opposed the petition on the ground Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill No. 1437) is unconstitutional, and alternatively argued petitioner was ineligible for relief. In support, the People relied on the factual and procedural history detailed in this court's opinion in petitioner's direct appeal. The People specifically argued petitioner's jury was not instructed on a natural and probable consequences theory,[14] and the record did not suggest the jury found petitioner guilty of second degree felony murder but rather under an implied malice theory. Additionally, the People argued the facts established petitioner either acted with implied malice or was a major participant in the underlying felony who acted with reckless indifference to human life.

The superior court determined petitioner had made a prima facie showing of resentencing eligibility and appointed counsel to represent him. After further briefing on the constitutionality of Senate Bill No. 1437, the court denied the People's request to dismiss the petition based on unconstitutionality and ordered petitioner to file a reply to the People's substantive opposition. The court indicated it would then determine whether

---

with the maximum period of confinement of 25 years to life. This court affirmed the adjudication." (*Muhammad*, *supra*, F043303.)

[14] This argument later was withdrawn after the People determined the jury had been instructed on a natural and probable consequences theory.

petitioner had stated a prima facie basis for relief.[15] Petitioner filed his reply. The matter was heard on June 26, 2020. On July 16, 2020, the superior court issued an order to show cause.

The People submitted a hearing brief in advance of the hearing. The People argued this court's opinion from petitioner's direct appeal should be admitted into evidence and would serve as "the principal evidence offered by the People." The People argued they were required to "show beyond a reasonable doubt that [petitioner] COULD BE convicted of first or second degree murder notwithstanding the amendments to [s]ections 188 and 189." The People asserted this merely required them to "demonstrate that there is enough evidence . . . from which a reasonable trier of fact could find [petitioner] guilty of murder beyond a reasonable doubt." Relying on *People v. Duke* (Sept. 28, 2020, B300430), opinion ordered nonpublished November 23, 2021, S265309, the People argued the superior court was not to sit "as a finder of fact in the first instance," but rather was to act "akin to an appellate court ruling on a sufficiency of the evidence claim." Relying on the factual summary from our opinion in petitioner's direct appeal, the People argued there was sufficient evidence from which a reasonable trier of fact could find that petitioner acted with implied malice as either a principal or an aider and abettor in the murder and, alternatively, that petitioner was a major participant in the underlying felony who acted with reckless indifference to human life.

In petitioner's hearing brief, petitioner acknowledged the standard to be applied by the superior court in determining petitioner's eligibility for resentencing was unsettled. However, petitioner argued the court was required to act as an independent fact finder,

---

[15] At the time the court issued its ruling, some Courts of Appeal had held that former section 1170.95, subdivision (c) required a court to conduct two different prima facie reviews, one to determine whether the petitioner " 'falls within the provisions' " of the statute and one to determine whether the petitioner is " 'entitled to relief.' " (E.g., *People v. Lewis* (2020) 43 Cal.App.5th 1128, 1140, reversed by *People v. Lewis* (2021) 11 Cal.5th 952, 962, 975 (*Lewis*).)

and the prosecution was required to prove the elements of murder under the amended law beyond a reasonable doubt. Petitioner argued he was not a major participant in the underlying felony and did not act with reckless indifference to human life.

The People then filed a supplemental hearing brief. They attached to their brief selected reporter's and clerk's transcripts from petitioner's direct appeal, including some of the printed jury instructions.[16] The People asserted petitioner's jury was instructed on felony murder only as it pertained to murder in the first degree. However, the jury convicted petitioner of second degree murder, thus excluding the possibility he was convicted under a felony-murder theory. Additionally, the People asserted the natural and probable consequences instruction given in petitioner's trial was erroneous, inasmuch as it identified murder as the target crime that petitioner aided and abetted (rather than robbery). Therefore, the People argued, the jury necessarily found that petitioner directly aided and abetted in the murder. Accordingly, the People argued, petitioner is ineligible for resentencing. The People argued this court's prior opinion and the portions of the trial transcripts and clerk's transcripts attached to their brief should be admitted into evidence. Lastly, in light of uncertainty in the state of the law, the People urged the superior court to find, based on the appellate opinion, both that sufficient evidence supported petitioner's conviction under a valid theory and that the evidence established beyond a reasonable doubt that petitioner acted with implied malice.

Petitioner also submitted a supplemental hearing brief. He argued "wholesale" reliance on the factual summary from a prior appellate opinion is impermissible to prove the circumstances of a crime. He again argued the People were required, at the

---

[16] The People's exhibits were not clearly identified. The excerpted portions of the reporter's transcripts included the reading of the verdict, the reading of the instructions, and proceedings to address jury questions during deliberations. No witness testimony was included. The excerpted portions of the clerk's transcripts appeared to include the verdict forms, selected jury instructions, selected jury questions and responses, as well as court minutes relating to jury deliberations.

evidentiary hearing, to prove his liability for murder beyond a reasonable doubt and that he was not a major participant and did not act with reckless disregard for human life.

## III.    Hearing and Ruling

The evidentiary hearing was conducted on March 19, 2021. The People moved to admit into evidence this court's prior opinion and the attachments to the People's hearing brief. Petitioner again objected to the court's consideration of the facts recited in our prior opinion. The court admitted this court's prior opinion over petitioner's objection and also admitted the attachments to the People's brief.

The court identified one of the People's arguments as follows: "[T]he People are arguing that [petitioner] was a direct aider and abettor and that's what the jury found. And the People can prove that beyond a reasonable doubt. Or he was a major participant . . . ; is that right?" The People affirmed the court's understanding was correct, "with some nuances." The parties then acknowledged the People's burden of proof was unsettled. The People argued that the evidence, as set forth in this court's opinion, demonstrated petitioner acted with implied malice and "that's what this jury found in this case." The People urged the court to conclude there was "some evidence in the record that would support implied malice" and also that implied malice and reckless indifference were "shown beyond a reasonable doubt." Petitioner's counsel focused on the trial testimony and the attorneys' closing arguments from petitioner's trial[17] to argue, "I don't think that they can prove that he acted with the kind of mindset that you need to have under the standards of . . . being a major participant or having a reckless disregard for life." Petitioner's counsel suggested the participants in the murder did not understand their conduct was dangerous to human life due to their age. The People rebutted petitioner's factual arguments with reference to the prior appellate opinion, noting that

---

[17] As discussed below, the record does not reflect the trial transcripts were admitted into evidence or made available to the superior court.

35.

some of Ricky's trial testimony was disputed, but the appellate opinion "implicitly" relied on that disputed testimony to resolve appellate issues against Raheem. Petitioner argued Ricky's testimony was "completely all over the place" and he testified to using drugs and drinking on the day of the incident. The court queried, "And the jury considered that, correct?" The court continued, "I mean, it was in evidence at the trial, correct?" Petitioner's counsel agreed, but noted the parties did not know everything the jury considered. The court took the matter under submission.

On April 16, 2021, the court denied the petition by written order. The court stated it had admitted "the prior record of conviction" as well as this court's prior opinion. The court then held the jury instructions established petitioner was not convicted of felony murder or murder under a natural and probable consequences theory. The court noted, however, that this determination was based upon "an apparent instructional error" and the court therefore did not "plan to rely on [this] argument" to find petitioner ineligible for resentencing.

The court then determined petitioner "had actual malice and was a major participant" in the underlying felony. (Underlining omitted.) In this regard, the court stated, "[B]ecause a review of the evidence establishes that the jury found [petitioner] acted with the intent to kill in aiding and abetting murder, was a major participant in the underlying felony (robbery) and acted with reckless indifference to human life he is not eligible for resentencing." With regard to malice, the court then recited facts it determined were relevant and stated, "Therefore, the evidence established beyond a reasonable doubt that [petitioner] acted with malice and is guilty of murder even with the amendments to the Penal Code." With regard to major participation, the court recited factors to be considered in that inquiry and stated, "[Petitioner] would be found guilty of felony murder even with the amendments to the statutes." The court recited facts it found relevant to this inquiry and concluded, "In sum, [petitioner] was a major participant in the robbery and murder . . . and would be found guilty of felony murder beyond a reasonable

36.

doubt even with the amendments to the statute." The court did not address whether petitioner acted with reckless indifference to human life. In a footnote, the court acknowledged a split in authority on the standard to be applied at the evidentiary hearing, but stated it was unnecessary to resolve this split "because the court finds that the People have demonstrated beyond a reasonable doubt that the petitioner is guilty of murder under current law."

## DISCUSSION[18]

### I. Pertinent Law Regarding the Evidentiary Hearing

Effective January 1, 2019, the Legislature passed Senate Bill No. 1437 "to amend the felony murder rule and the natural and probable consequences doctrine . . . to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f); accord, *People v. Strong* (2022) 13 Cal.5th 698, 707-708 (*Strong*).) The bill amended the natural and probable consequences doctrine by requiring that a principal act with malice aforethought before he or she may be convicted of murder. (§ 188, subd. (a)(3); accord, *People v. Gentile* (2020) 10 Cal.5th 830, 842-843 (*Gentile*).) The bill amended the felony-murder rule by providing that a participant in a qualifying felony is liable for murder only if the victim was a peace officer in the performance of his or her duties, or the defendant was the actual killer, aided and abetted the actual killer in the commission of first degree murder with the intent to kill, or was a major participant in the felony and acted with reckless indifference to human life. (§ 189, subds. (e), (f); accord, *Strong*, at p. 708.)

---

[18] For efficiency, we do not address petitioner's arguments in the order they were briefed.

Senate Bill No. 1437 also added former section 1170.95, now renumbered as section 1172.6, which provides a procedure for persons convicted of "felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime" to seek vacatur of the conviction and resentencing. (§ 1172.6, subd. (a); accord, *Gentile*, *supra*, 10 Cal.5th at p. 853.) Under section 1172.6, an offender seeking resentencing must first file a petition in the sentencing court, and the sentencing court must determine whether the petitioner has made a prima facie showing that he or she is entitled to relief. (§ 1172.6, subds. (a)-(c); accord, *Strong*, *supra*, 13 Cal.5th at p. 708.) If the trial court determines the petitioner has made such a showing, "the trial court must issue an order to show cause and hold a hearing to determine whether to vacate the murder conviction and to resentence the petitioner on any remaining counts." (*Gentile*, *supra*, 10 Cal.5th at p. 853; accord, § 1172.6, subds. (c), (d)(1).)

At this evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder . . . under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).) Significantly, "[a] finding that there is substantial evidence to support a conviction for murder . . . is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (*Ibid*.) The prosecutor and the petitioner may offer new or additional evidence to meet their respective burdens. The admission of evidence at the hearing is governed by the Evidence Code. However, the court also "may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed," as well as the "procedural history of the case recited in any prior appellate opinion." (§ 1172.6, subd. (d)(3).)

We review the trial court's findings following the evidentiary hearing for substantial evidence, and the application of those facts to the statute de novo. (*People v. Cooper* (2022) 77 Cal.App.5th 393, 412.)

## II. Arguments Relating to Jury Instructions

The superior court determined the jury instructions and verdict suggested petitioner was not convicted of murder under a felony murder or natural and probable consequences theory, but rather as a direct aider and abettor. The court concluded this was a "possible basis" for finding petitioner ineligible for resentencing. Petitioner argues the court erred in concluding the instructions established the verdict was based on direct aider and abettor liability. He further argues the instructions and verdict compel a contrary conclusion: that resentencing is mandatory pursuant to section 1172.6, subdivision (d)(2) because, petitioner argues, the jury found he was not a major participant in the underlying robbery and did not act with reckless indifference to human life. We address these arguments in turn.

### A. The Instructions and Verdict

Petitioner's jury was instructed as follows with regard to murder: "Every person who unlawfully kills a human being with malice aforethought or during the commission or attempted commission of robbery, is guilty of the crime of murder . . . ." The jury also was instructed on general principles of express and implied malice. Additionally, the jury was instructed on aider and abettor liability as follows:

> "Persons who are involved in committing a crime are referred to as principals in that crime. Each principal, regardless of the extent or manner of participation is equally guilty. Principals include:
>
> "1. Those who directly and actively commit the act constituting the crime; or
>
> "2. Those who aid and abet the commission of the crime.
>
> "A person aids and abets the commission of a crime when he,

39.

"1. With knowledge of the unlawful purpose of the perpetrator; and

"2. With the intent or purpose of committing or encouraging or facilitating the commission of the crime; and

"3. By act or advice aids, promotes, encourages or instigates the commission of the crime."

With regard to the natural and probable consequences doctrine, the court instructed the jury: "One who aids and abets another in the commission of a crime or crimes is not only guilty of that crime, but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime originally aided and abetted." The instructions further explained:

"In order to find the defendant guilty of the crime of murder, as charged in Count 1, you must be satisfied beyond a reasonable doubt that:

"1. The crime of murder was committed;

"2. That the defendant aided and abetted that crime;

"3. That a co-principal in that crime committed the crime of murder; and

"4. That the crime of murder was a natural and probable consequence of the commission of the crime of robbery."

As to felony murder, the jury was instructed that an unlawful killing "which occurs during the commission of the crime of robbery is murder of the first degree when the perpetrator had the specific intent to commit that crime." With regard to felony murder involving an aider and abettor, the jury was instructed, "If a human being is killed by any one of several persons engaged in the commission of the crime of robbery, all persons, who either directly and actively commit the act constituting that crime, or who with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating commission of the offense, aid, promote, encourage, or instigate by act or advice its commission, are guilty of

40.

murder of the first degree, whether the killing is intentionally [*sic*], unintentional, or accidental."

The jury additionally was instructed that, if it found petitioner guilty of first degree murder, it must determine whether a robbery-murder special circumstance was true or not true. In this regard, the jury was instructed it could find the special circumstance true only if it found petitioner was the actual killer, aided and abetted in the murder with intent to kill, or aided and abetted in a robbery of Escareno as a major participant and with reckless indifference to human life.

The jury was instructed as to second degree murder under theories involving both express and implied malice:

> "Murder of the second degree is also the unlawful killing of a human being with malice aforethought when the perpetrator intended unlawfully to kill a human being but the evidence is insufficient to prove deliberation and premeditation.
>
> "Murder of the second degree is also the unlawful killing of a human being when:
>
> "1. . . . The killing resulted from an intentional act;
>
> "2. The natural consequences of the act are dangerous to human life; and
>
> "3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard, for human life."

The jury found petitioner not guilty of first degree felony murder and therefore did not render a finding on the robbery-murder special circumstance allegation that was attached to this charge. However, the jury found petitioner guilty of second degree murder.

**B.  The Instructions and Verdict Do Not Establish Petitioner's Ineligibility for Resentencing as a Matter of Law**

Petitioner argues the jury instructions do not establish he was convicted as a direct aider and abettor, and therefore do not establish his ineligibility for resentencing as a matter of law.  Despite their arguments below, the People now agree the instructions leave unclear the theory relied on by the jury to find petitioner guilty of second degree murder.  Accordingly, the People no longer argue the instructions support denial of the petition.  We agree the instructions do not support denial of the petition.

The superior court noted the natural and probable consequences jury instruction contained an error, inasmuch as it appeared to have inadvertently identified murder, as opposed to robbery, as the target offense.  Specifically, the natural and probable consequences instruction stated:  "In order to find the defendant guilty of the crime of murder, as charged in Count 1, you must be satisfied beyond a reasonable doubt that:  [¶] 1.  The crime of *murder* was committed; [and ¶] 2.  That the defendant aided and abetted *that crime* . . . ."  (Italics added.)  Thus, the superior court concluded the jury necessarily found petitioner directly aided and abetted in the murder.  Accordingly, the court stated section 1172.6 "is not applicable" to petitioner and "[t]his is a possible basis for finding [petitioner] ineligible for resentencing."  However, because this argument rested on instructional error, the court "[did] not plan to rely on [this] argument to find [petitioner] is nonetheless ineligible for resentencing."

As an initial matter, we note the People's argument below regarding the jury instructions was untimely.  At the evidentiary hearing stage of the section 1172.6 petition process, the court sits as an independent fact finder to determine whether the People have proved the defendant's guilt beyond a reasonable doubt. (§ 1172.6, subd. (d)(3); accord, *Strong*, *supra*, 13 Cal.5th at p. 709.)  Thus, at the evidentiary hearing stage, the court does not review determinations made by a prior jury in the underlying case. (See *Strong*, at p. 720; § 1172.6, subd. (d)(3) ["A finding that there is substantial evidence to support a

conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing."].) Rather, the question of whether the jury instructions conclusively establish a petitioner's ineligibility for resentencing is resolved at the prima facie stage of review, prior to the issuance of an order to show cause. (*Strong*, at p. 708.)

Additionally, to the extent the superior court was inclined to reconsider the issuance of the order to show cause, the jury instructions do not conclusively establish petitioner's ineligibility for resentencing. (See *Strong*, *supra*, 13 Cal.5th at p. 708 [court may dismiss a petition at the prima facie stage if the record establishes conclusively that the petitioner is ineligible for relief].) Section 1172.6 permits resentencing petitions by petitioners who were convicted of felony murder or murder under the natural and probable consequences doctrine or other theory of imputed malice. (§ 1172.6, subd. (a); see *Strong*, at p. 720 ["Section 1172.6 offers resentencing for petitioners who have not been determined beyond a reasonable doubt to have the degree of culpability now required for a murder, attempted murder, or manslaughter conviction."].) Although the instructions and verdict make clear that petitioner was not found guilty under a felony-murder theory, we cannot say the instructions exclude the possibility petitioner was convicted under a natural and probable consequences theory.

Petitioner's jury was instructed that second degree murder is an unlawful killing in which the perpetrator intends to kill or commits an intentional act with knowledge of and conscious disregard for the danger to human life. Additionally, the jury was instructed that principals in a crime include those who aid and abet the commission of a crime "[w]ith knowledge of the unlawful purpose of the perpetrator" and "the intent or purpose of committing or encouraging or facilitating the commission of the crime." However, the jury also was instructed that "[o]ne who aids and abets another in the commission of a crime or crimes is not only guilty of that crime, but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime

43.

originally aided and abetted." Taken together, these instructions permitted the jury to find petitioner guilty of murder under a natural and probable consequences theory.

The subsequent erroneous instruction suggested that, to find petitioner guilty under a natural and probable consequences theory, the jury was required to find that petitioner aided and abetted the crime of murder, and that murder was a natural and probable consequence of the commission of the crime of robbery. It is difficult to discern how the jury may have interpreted this confusing instruction. However, in light of the more broadly worded natural and probable consequence instruction—that an aider and abettor "is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime originally aided and abetted,"—we cannot say that this errant language conclusively dispelled any possibility that the jury found petitioner guilty under a natural and probable consequences theory.

Accordingly, the instructions do not establish petitioner's ineligibility for resentencing as a matter of law, and therefore do not support denial of the petition.

## C. The Instructions and Verdict Do Not Establish Petitioner's Entitlement to Resentencing as a Matter of Law

Petitioner argues the superior court was required to recall his sentence and resentence him because the jury necessarily determined petitioner was not a major participant in the underlying robbery or did not act with reckless indifference to human life. The People do not respond to this argument. Nevertheless, we conclude it is without merit.

Section 1172.6, subdivision (d)(2) states in full: "The parties may waive a resentencing hearing and stipulate that the petitioner is eligible to have the murder, attempted murder, or manslaughter conviction vacated and to be resentenced. *If there was a prior finding by a court or jury that the petitioner did not act with reckless indifference to human life or was not a major participant in the felony, the court shall vacate the petitioner's conviction and resentence the petitioner*." (Italics added.) Prior

findings that require resentencing include acquittal on a special circumstance allegation that would have required the jury to find the defendant was a major participant in the felony and acted with reckless indifference to human life. (*People v. Harrison* (2021) 73 Cal.App.5th 429, 440; *People v. Clayton* (2021) 66 Cal.App.5th 145, 154-155.) Where the jury has acquitted on such allegations, "[t]he court is not authorized to reverse the prior finding or substitute its own factual findings for the specific findings the jury already made." (*Clayton*, at p. 155.) However, where a jury has found one special circumstance allegation not true and deadlocked on others, resentencing is not mandatory. (*People v. Guillory* (2022) 82 Cal.App.5th 326, 333-334.) This is because the verdict leaves open the possibility the petitioner could be found guilty of murder under other, still valid theories. (*Ibid.*) These cases suggest section 1172.6, subdivision (d)(2) requires resentencing where an unproven special circumstance allegation provided the only viable ground for conviction. (*Guillory*, at p. 334.)

Here, the jury did not acquit petitioner on the special circumstance allegation. Rather, the jury acquitted petitioner of first degree felony murder and did not address the special circumstance allegation. Thus, the jury did not directly address the allegation that he was a major participant in the robbery and acted with reckless indifference to human life. Moreover, other viable theories of conviction were available to the jury, including direct aiding and abetting, and the formerly viable natural and probable consequences theory. Accordingly, the jury's determination that petitioner was not guilty of first degree felony murder does not constitute a prior finding that requires resentencing pursuant to section 1172.6, subdivision (d)(2).

## III. Reliance on the Appellate Opinion

Petitioner argues the superior court erred in relying on the appellate opinion to make factual findings. The People initially argued the court permissibly relied solely on the appellate opinion. However, in supplemental briefing, the People argue petitioner has not established the court relied on the opinion as evidence, contending instead that the

court relied on petitioner's trial transcripts. We conclude reversal is appropriate because the factual summary in an appellate opinion is not evidence that may be considered at an evidentiary hearing to determine a petitioner's eligibility for resentencing, and the appellate opinion was the only factual record before the superior court.

## A. Applicable Law

At the time of petitioner's hearing, former section 1170.95, subdivision (d)(3) did not specify the evidence that could be relied on at the evidentiary hearing, stating only that "[t]he prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens." (Former § 1170.95, subd. (d)(3); see Stats. 2018, ch. 1015, § 4.) At least one court had relied on case law applicable to other postconviction proceedings to conclude the section 1172.6 evidentiary hearing was not constrained by the rules of evidence. (*People v. Williams* (2020) 57 Cal.App.5th 652, 661-662.) Thus, the court held that a superior court reviewing a section 1172.6 petition could consider reliable hearsay, including the statement of facts contained in a prior appellate opinion. (*Williams*, at p. 662.)

Subsequently, in *Lewis*, our Supreme Court cautioned that "the probative value of an appellate opinion is case specific, and 'it is certainly correct that an appellate opinion might not supply all answers.' " (*Lewis*, *supra*, 11 Cal.5th at p. 972.) Thereafter, the Legislature "[a]ddresse[d] what evidence a court may consider at a resentencing hearing (clarifying the discussion in *People v. Lewis*, *supra*, at pp. 970-972)." (Sen. Bill No. 775, Stats. 2021, ch. 551, § 1, subd. (d), italics added (Senate Bill No. 775).) It did so by amending section 1172.6, subdivision (d)(3) to specify that the admission of evidence at the evidentiary hearing is governed by the Evidence Code, except that the court may consider certain other specified evidence, including "the procedural history of the case recited in any prior appellate opinion." (§ 1172.6, subd. (d)(3).) Courts have interpreted this provision as prohibiting a court from relying on the factual summary contained in an

46.

appellate opinion as evidence at the section 1172.6 evidentiary hearing. (*People v. Flores* (2022) 76 Cal.App.5th 974, 988; *People v. Clements* (2022) 75 Cal.App.5th 276, 292.)

## B. The Superior Court Relied on the Appellate Opinion

As previously stated, the People argue petitioner has not established the court relied on the appellate opinion as evidence. In this regard, the People note the court stated in its written ruling that it had, at the hearing, "admitted the prior record of conviction," which the People argue necessarily includes the trial transcripts.

This argument is not credible. At the hearing in the superior court, the People moved to admit into evidence our prior opinion and excerpted trial transcripts that did not contain witness testimony, and which were attached to the People's brief. The court admitted the prior opinion and "the attachments to [the prosecutor's] brief." The court admitted no other records.

Moreover, the record on appeal in the instant case does not contain the trial transcripts, and the People did not move to augment the record on appeal to include such transcripts or notice any record omissions. (See Cal. Rules of Court, rule 8.155(a), (b).) Rather, the People asked us to judicially notice the record on appeal from petitioner's prior appeal, or to incorporate the prior record on appeal by reference. (See fn. 2, *ante*.) There is therefore no basis to conclude the transcripts were available to the trial court or admitted into evidence.

Lastly, we note the People's representation that the trial transcripts are comprised of 38 volumes containing 11,101 pages. It strains credulity to suggest the superior court reviewed these voluminous transcripts sua sponte, without citations or argument supporting the People's position, and found the transcripts established beyond a reasonable doubt that petitioner is guilty of murder under a valid theory.

We therefore are compelled to conclude the superior court relied on the appellate opinion as the sole factual support for its findings.

### C. Analysis

As previously noted, section 1172.6, subdivision (d)(3) now prohibits a superior court from relying on the factual summary contained in an appellate opinion at the evidentiary hearing stage. (See Sen. Bill No. 775, Stats. 2021, ch. 551, § 2.) The People concede this amendment applies to petitioner's case.

Recently, in *People v. Owens* (2022) 78 Cal.App.5th 1015, 1026-1027, a majority of the court suggested in dicta that the amendments pertaining to admissibility of evidence at the evidentiary hearing may not be retroactive. We note, however, that even if the evidentiary provisions of Senate Bill No. 775 do not operate retroactively, petitioner would be free to file a new petition for resentencing under the current law.[19]

In light of the People's concession and in the interests of judicial economy, we consider it appropriate to reverse the superior court's order denying the petition and remand for a new evidentiary hearing under section 1172.6, subdivision (d)(3), as amended by Senate Bill No. 775. We take no position on petitioner's ultimate eligibility for resentencing.

## IV. Remaining Contentions

Because our foregoing conclusion is dispositive, we address petitioner's remaining contentions only to the extent they are relevant on remand.

---

[19] We additionally note our Supreme Court's admonition that, even under former section 1170.95, " 'an appellate opinion might not supply all answers.' " (*Lewis*, *supra*, 11 Cal.5th at p. 972.) Here, the factual summary in the appellate opinion recounted differing versions of petitioner's participation in the murder. According to some witnesses, petitioner was a mere bystander. According to others, he was one of the assailants. In one version of the events, petitioner attempted to discourage others from continuing the beating. It is difficult to discern how the superior court could have concluded, beyond a reasonable doubt, that one version of these events should be credited over another based solely on the factual summary from an appellate opinion which did not resolve these conflicts in the evidence. (See *People v. Harris* (2013) 57 Cal.4th 804, 849 [appellate court does not resolve credibility issues or evidentiary conflicts].)

## A.     The Standard of Review

Petitioner argues the superior court reviewed the evidence under an incorrect legal standard. Specifically, petitioner argues the superior court did not sit as an independent fact finder as required under section 1172.6, subdivision (d)(3), but rather determined substantial evidence supported the jury's verdict. The People argue the superior court correctly acted as an independent finder of fact.

Former section 1170.95, subdivision (d)(3) originally provided, "At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (Former § 1170.95, subd. (d)(3); see Stats. 2018, ch. 1015, § 4.) Appellate courts initially reached differing conclusions regarding the meaning of this provision as it related to the prosecutor's burden of proof and the court's role in that determination. (See *People v. Garrison* (2021) 73 Cal.App.5th 735, 745.) A majority of courts concluded the trial court was to act as an independent fact finder and the prosecution bore the burden of proving beyond a reasonable doubt that the petitioner was guilty of murder under a valid theory. (See, e.g., *People v. Fortman* (May 13, 2021, B304567), opn. ordered nonpub. Dec. 22, 2021, S269228; *People v. Clements* (Feb. 4, 2021, E073965), opn. ordered nonpub. Dec. 22, 2021, S267624; *People v. Rodriguez* (Dec. 7, 2020, B303099), opn. ordered nonpub. Dec. 22, 2021, S266652; *People v. Lopez* (Oct. 30, 2020, H047254) opn. ordered nonpub. Dec. 22, 2021, S265974.) However, in *People v. Duke*, *supra*, B300430, the court held the prosecution was merely required to prove "beyond a reasonable doubt that the defendant *could* still have been convicted of murder under the new law," which the court characterized as "essentially identical to the standard of substantial evidence."

After the superior court ruled on the instant petition, Senate Bill No. 775 amended section 1172.6, subdivision (d)(3) to clarify that the prosecution's burden of proof at the evidentiary hearing is "to prove, beyond a reasonable doubt, that the petitioner is guilty of

49.

murder . . . under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." The new legislation expressly provides, "A finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (See § 1172.6, subd. (d)(3).) This amendment requires "the trial court, acting as an independent fact finder, to determine beyond a reasonable doubt whether defendant is guilty of murder under a valid theory of murder." (*Garrison*, *supra*, 73 Cal.App.5th at p. 745.) The parties agree this standard is applicable in this case.

Here, the court's ruling does not provide significant clarity regarding the standard the court applied in determining petitioner was ineligible for resentencing. On the one hand, the court stated in a footnote that "the court finds that the People have demonstrated beyond a reasonable doubt that the petitioner is guilty of murder under current law." The court also stated "the evidence established beyond a reasonable doubt that [petitioner] acted with malice and is guilty of murder even with the amendments to the Penal Code." On the other hand, in summarizing its holding, the court stated, "[B]ecause a review of the evidence establishes that *the jury found* [petitioner] acted with the intent to kill in aiding and abetting murder, was a major participant in the underlying felony (robbery) and acted with reckless indifference to human life he is not eligible for resentencing." (Italics added.) The court also stated "[petitioner] *would* be found guilty of felony murder even with the amendments to the statutes." (Italics added.) These latter statements suggest the court may have concluded the People established beyond a reasonable doubt that the jury had convicted petitioner under a valid theory of murder, or would convict petitioner if properly instructed on valid theories of murder under the amended law. Taken together, the foregoing statements leave considerable doubt as to

whether the court acted as an independent fact finder to find petitioner guilty of murder beyond a reasonable doubt, as required under section 1172.6, subdivision (d)(3).[20]

On remand, petitioner is entitled to a new evidentiary hearing at which the superior court sits as an independent fact finder and the prosecutor bears the burden of proving beyond a reasonable doubt that petitioner is guilty of murder under a valid theory. (§ 1172.6, subd. (d)(3).)

## B. Felony-murder Theories

Petitioner contends the superior court erred in finding him ineligible for resentencing as a major participant in the underlying felony who acted with reckless indifference to human life because (1) the jury acquitted him of first degree felony murder and the superior court therefore was not permitted to find him guilty under such theory and (2) second degree felony murder is not a valid theory of murder.

In this regard, we note petitioner did not raise these arguments in the superior court. The arguments are therefore forfeited on appeal and we will not address them. (*People v. Dykes* (2009) 46 Cal.4th 731, 761 [failure to object in the trial court forfeits claim on appeal].) To the extent this issue arises on remand, petitioner may raise these arguments in the superior court.

---

[20] Other parts of the record contribute to the lack of clarity. During the hearing, the court queried whether certain conflicting evidence had been presented to the jury. Although the People urged the superior court to find petitioner ineligible for resentencing both based upon what the jury found and what the court itself could find, the People's argument at the hearing focused largely on the jury's findings and the evidence to support those findings. The arguments of petitioner's counsel likewise focused heavily on what the jury might have considered and determined, or what a hypothetical jury would determine if the matter were retried. The superior court's wholesale reliance on the appellate opinion also suggests the court may not have acted as an independent fact finder.

### C. Effect of Petitioner's Youth

Petitioner argues the court should have taken his youth into account in evaluating his petition.

In the superior court, petitioner argued his youth at the time of the offense prevented him from understanding his conduct was dangerous to human life, and thus he did not act with reckless indifference. The superior court considered and rejected this argument in its written order. Because we will reverse the order on other grounds, we need not consider whether the court's findings in this regard were supported by substantial evidence.

On remand, petitioner is free to present argument and evidence regarding any factors he believes are relevant to the question of whether he acted with the required mental state.

## DISPOSITION

The order denying petitioner's section 1172.6 petition for resentencing is reversed and the matter is remanded for the superior court to hold a new evidentiary hearing pursuant to section 1172.6, subdivision (d)(3).

DETJEN, J.

WE CONCUR:

LEVY, Acting P. J.

POOCHIGIAN, J.

52.